UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADAN MELVIN GALINDO GOMEZ a/k/a ADAN GALINDO<br><br>Plaintiffs<br><br>-against-<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>Defendant | Civil Action Doc. 1:19-cv-03456-ABJ<br><br>FIRST AMENDED COMPLAINT |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS OR ALTERNATIVELY TO TRANSFER VENUE**

**CORRECTION TO DEFENDANT'S STATEMENT OF FACTS**

The USCIS' Statement of Facts asserts that "Plaintiff did not depart the United States pursuant to the deportation order," ECF Doc. 15-1 at 3. In fact, the agency's Decision notes that "the Immigration Judge issued a final order of deportation on June 7, 1994", Exhibit A at 1, and its own Memorandum states that Adan Galindo Gomez (Mr. Galindo) left "the United States on August 11, 2016, and returning to the country on the same day in order to resume his TPS." ECF Doc. 15-1 at 3. Since there is no claim that Mr. Galindo's removal order has ever been set aside[1], therefore the record shows that he did depart the U.S. pursuant to his deportation order on August 11, 2016. The agency's assertion to the contrary is untrue[2].

**ARGUMENT**

**I.     THIS COURT HAS SUBJECT MATTER OVER THIS ACTION.**

---

[1] Although it was executed by his departure from the U.S. on August 11, 2016. 8 U.S.C. § 1101(g).
[2] The USCIS argues in its memo that Mr. Galindo's departure did not execute the removal order. This argument, although , as shown below, is unsupported by, and in fact contrary to, both the law and the agency's own policy, is nevertheless unrelated to factual question of whether Mr. Galindo was subject to a deportation order when he left the U.S., and therefore left "pursuant" to it.

1

This being a civil action against the United States arising under the Administrative Procedure Act, 5 USC § 701 et seq.,a law of the United States, original jurisdiction over this matter is vested in this Court by 28 U.S.C. § 1331. Neither of the USCIS' arguments that this Court lacks jurisdiction over this action withstand analysis.

### A. The denial of Mr. Galindo's application for adjustment of status was a "final action" for the purposes of the Administrative Procedure Act.

An application to adjust status is a final agency action within the meaning of the APA when no removal proceedings are pending. *See Cabaccang v. U.S. Citizenship & Immigration Servs.*, 627 F.3d 1313, 1317 (9th Cir. 2010)*; Pinho v. Gonzales*, 432 F.3d 193, 202 (3d Cir. 2005); *Hosseini v. Johnson*, 826 F.3d 354, 362 (6th Cir. 2016). As the Sixth Circuit explains:

> The Third Circuit's opinion in *Pinho v. Gonzales*, 432 F.3d 193 (3d Cir. 2005), is particularly instructive. In that case, the court held that the agency's denial of an application for adjustment of status was final within the meaning of the APA, because no removal proceedings were pending. *Id.* at 200-01. Pinho had applied for adjustment of his immigration status to "permanent resident" under 8 U.S.C. § 1255. *Id.* at 197. The Immigration and Naturalization Service ("INS") denied adjustment after finding that Pinho was inadmissible for having pled guilty to a crime relating to a controlled substance. *Id.* However, no removal proceedings were instituted against Pinho. *See id.* at 201. Thereafter, Pinho filed a complaint in federal district court seeking a declaratory [**14] judgment that the denial of his adjustment of status was arbitrary, capricious, and unlawful. *Id.* at 198. The district court denied Pinho's request on the merits, and he appealed. *Id.* at 198-99.
> On appeal, the Third Circuit pointed out the unique posture of the case—there had been "no hearing before an Immigration Judge" and "no appeal to the [Board of Immigration Appeals]." *Id.* at 200. And "[i]f the agency institutes removal proceedings against" Pinho at some future time, he could renew his application during those proceedings. *See id.* at 200-01. However, the court found the hypothetical possibility of future removal proceedings insufficient to render the agency's determination tentative or interlocutory. *Id.* The court reasoned that "if the agency does not seek to deport [Pinho], there can never be an appeal within the agency by which any higher level of administrative authority can be invoked to review the legal determination made by the" agency. *Id.* at 201. Additionally, because Pinho had no other avenue for administrative appeal, "Pinho had no further opportunity to challenge the legality of the decision within the agency." *Id.* An applicant should not be "forced to await deportation proceedings that the agency may or may not choose to institute." *Id.*

*Hossein*, 826 F. 3d at 361.

Even the very D.C. authority the agency relies upon, *Meza v. Cuccinelli*, Doc. CV 19-1322 (CKK), 2020 U.S. Dist. LEXIS 21328, 2020 WL 601888, (D.D.C. Feb. 7, 2020), observes that

"courts have generally refrained from finding there is no jurisdiction when there is no way for plaintiff to seek relief through a removal proceeding. An illustrative example is *Hosseini v. Johnson*, 826 F.3d 354 (6th Cir. 2016)." *Meza*, 2020 U.S. Dist. LEXIS 21328 at *15-16.

Nevertheless, apparently the agency believes that it has distinguished these cases by its assertion that "Plaintiff is in deportation proceedings" ECF Doc. 15-1 at 6. But this is, again, incorrect. Mr. Galindo's departure from the United States on August 11, 2016 terminated his removal proceedings. 8 C.F.R. § **245.1(c)(8)(ii)** provides in relevant part that:

> The period during which the alien is in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto, terminates:
>
> **(A)** When the alien departs from the United States while an order of exclusion, deportation, or removal is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation or removal;

Therefore, inasmuch as Mr. Galindo is not in removal proceedings, he has no other remedies to pursue, and so the order denying his application for adjustment of status is final and this Court has subject matter jurisdiction over this action.³

**B. Since Mr. Galindo does not have a removal order, 8 U.S.C. § 1252(a)(5) doesn't apply**

USCIS claims that "(a)t bottom, (Mr. Galindo's) complaint is a collateral attack on that deportation order." ECF Doc 15-1 at 8. However, this argument fails too because there is no longer any deportation order for Mr. Galindo to attack. His departure from the United States on June 11, 2016, after the 1994 issuance of a removal order, executed it. *Nicusor-Remus v. Sessions*, 902 F.3d 895, 900 (9th Cir. 2018)("We conclude that Nicusor executed the 2002 removal order when he departed the United States in 2004. Because there is no final removal order in this case, this Court lacks jurisdiction to hear Nicusor's petition."). Likewise here there is no final

---

³ The USCIS comments that "(t)o the extent that Plaintiff claims his August 11, 2016, travel from the United States executed his removal order (which he does not allege in his complaint), then he would be statutorily inadmissible for ten years from his date of departure. *See* 8 U.S.C. § 1182(a)(9)(A)(ii)(II)." ECF Doc. 15-1 at 13, nt. 7. However, that is immaterial to this action inasmuch as "(t)he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

removal order because Mr. Galindo's 2016 departure executed it. This is true even though he was granted advance parole prior to his departure. "If an alien who is the subject of an outstanding order of removal departs from the U.S., even with an advance parole, he or she effects the order (i.e., self-deports). See section 101(g) of the Act.)" Adjudicator's Field Manual § 54.2[4].

Further, because his removal order has been executed, Mr. Galindo is not seeking "judicial review of any questions of law and fact . . . arising from any action taken or proceeding brought to remove him from the U.S.". ECF Doc. 15-1 at 8, quoting 8 U.S.C. § 1252(b)(9). Rather he is seeking judicial review of the USCIS' denial of his application for adjustment of status. This has no relevance to Mr. Galindo's removal order, because he no longer has one. All of the cases cited by the agency are distinguishable because in each of them the noncitizen had an unexecuted final removal order. Mr. Galindo does not.

Similarly, 8 U.S.C. § 1252(g) is no hurdle here, insurmountable or otherwise, because this is not a "cause or claim … arising from the decision … to commence proceedings, adjudicate cases, or *execute removal orders* …." 8 U.S.C. § 1252(g) (emphasis added). A grant of adjustment of status is not even an indirect bar to the execution of an executed removal order because, of course, the government cannot execute a removal order that has already been executed. See *DiGrado v. Ashcroft*, 184 F. Supp. 2d 227, 231 (N.D.N.Y. 2002).

In *DiGrado* the noncitizen was removed from the United States. Subsequently he was arrested trying to return to the country and filed a habeas corpus petition seeking release because he claimed he was improperly denied the opportunity to apply for relief under former 8 U.S.C. § 1182(c) (INA § 212(c)). The government moved to dismiss his claim under § 1252(g) but the Court declined, opining that "(t)he challenge by DiGrado does not relate, in any way, to the decision of the Attorney General to **execute** the final order of removal. As respondent notes throughout his papers in support of his motion to dismiss, the deportation order was executed in

---

[4] As noted the Adjudicator's Field Manual, at least prior to its incorporation in the USCIS Policy Manual was binding on all USCIS officers. AFM § 3.4. This incorporation did not occur until May 21, 2020, so the contents of AFM were binding policy materials at least until that date. See attached Exhibit C.

1999. Thus, *Foster* ( a case dismissing a claim under § 1252(g)) provides no support for respondent's jurisdictional argument." *Id.* at 231. Nor does § 1252(g) help the agency here.

Still, the USCIS argues that Section 304 of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 ("MTINA") prevented Mr. Galindo's removal order from being executed. However, this simply directed the USCIS to inspect and admit TPS beneficiaries in "the same immigration status the alien had at the time of departure." But here the record shows that the USCIS did not comply with it, but rather paroled Mr. Galindo into the U.S., making him an arriving alien. Exhibit B. Therefore MTINA in fact has no relevance here.

Nevertheless, the agency would read the MTINA to require the Courts to pretend that Mr. Galindo was inspected and admitted to the U.S., even with the record showing indisputably that he was paroled. But nothing in the MTINA instructs the Courts to disregard what actually happened when a TPS beneficiary entered the U.S. and instead imagine that what Congress instructed the DHS to do actually occurred. If it did so provide, then a TPS beneficiary granted travel permission by the DHS would be deemed to be inspected and admitted in the same status as when he departed even if he subsequently entered the U.S. without inspection. Such an absurd outcome demonstrates that the MTINA cannot possibly have the meaning ascribed to it by the USCIS here. In any event, if Congress had intended such an unlikely result, it would have written that a TPS beneficiary entering the U.S. after receiving DHS permission to travel would be **deemed** to have been inspected and admitted. The MTINA should be read using the words Congress actually wrote, and not in a way which is not only inconsistent with the plain language of the statute, but which leads to absurd results.

But even assuming that Mr. Galindo is deemed to have been "inspected and admitted in the same status which (he) had at the time of departure", that still does not support the agency's conclusion that his departure did not execute his removal order. As the Board of Immigration Appeals has explained:

> Status" is a term of art, which is used in the immigration laws in a manner consistent with the common legal definition. It denotes someone who possesses a certain legal standing, e.g., classification as an immigrant or nonimmigrant. The use of the word "any" to modify the

5

word "status" indicates that Congress intended section 240A(a)(2) to include admissions of nonimmigrants as well as immigrants. Thus, the plain language of section 240A(a)(2) [requiring, as condition of cancellation of removal, that one "has resided in the United States continuously for 7 years after having been admitted in any status"] encompasses nonimmigrants admitted to the United States who thereafter reside in the United States for at least 7 years.

*Matter of BLANCAS-Lara*, 23 I. & N. Dec. 458, 460 (B.I.A. June 10, 2002) [square bracketed words added for clarity]

The "legal standing, e.g., classification as an immigrant or nonimmigrant" which Mr. Galindo possessed at the time of his departure from the United States was Temporary Protected Status. This was "for purposes of adjustment of status under (8 U.S.C. § 1255) and change of status under (8 U.S.C. § 1258), … (a) lawful status as a nonimmigrant." 8 U.S.C. § 1254(f)(4). Therefore, even if one assumes that all happened as MTINA directed the DHS it should happen, rather than as it did, still Mr. Galindo could not be admitted and inspected in the status of a person who "entered without inspection and is subject to a final order of deportation" because neither of these are classifications as immigrant or nonimmigrant. The USCIS' argument to the contrary fails because it is inconsistent with the Board's interpretation of the term "status" which, if the MTINA is ambiguous, is to be given *Chevron* deference.

However, in fact, the MTINA is **not** ambiguous – rather it unambiguously uses the "status" according to its plain meaning, as articulated by the Board. The USCIS must agree, since " decisions of the Board and decisions of the Attorney General are binding on all officers and employees of DHS or immigration judges in the administration of the immigration laws of the United States." 8 C.F.R. § 1003.1(g)(1).

Finally, the USCIS points out correctly that the DHS cannot execute a removal order against a TPS beneficiary. 8 U.S.C. § 1254(a)(1)(A). However, the fact that the Act specifically states that the DHS cannot execute a removal, but says nothing about such a person self-deporting, actually shows that Congress intended that 8 U.S.C. § 1101(g), providing that a person's departure from the U.S. after having been ordered removed, executes the removal order, still applies. "The expression of one thing implies the exclusion of others (*expressio unius est exclusion alterius*)"). *Jennings v.*

*Rodriguez*, 138 S. Ct. 830, 844 (2018), citing A. Scalia & B. Garner, Reading Law 107 (2012) ("Negative-Implication Canon").

Further authority, were more needed beyond that of the Supreme Court, can be found *Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165 (M.D. Ala. 2011). There the Court observed that :

> in addition, some unauthorized aliens are not removable under federal law. For instance, Congress has established the category of "temporary protective status", *See* 8 U.S.C. § 1254a, whereby the Secretary of Homeland Security can classify foreign countries as too unsafe or impractical to deport foreign nationals to. Typically, this occurs if there is an ongoing armed conflict or environmental disaster in the area. As of December 1, 2011, nationals of El Salvador, Haiti, Honduras, Nicaragua, Somalia, Sudan, and South Sudan are eligible for TPS. Alabama's policy of encouraging "self-deportation" of these individuals is an obstacle to federal policy.

*Id*. at 1182-118  If TPS beneficiaries were incapable of self-deporting, then Alabama's policy of encouraging them to do so would not have been considered an obstacle to federal policy.

Yet more authority that a departure from the U.S. by a TPS beneficiary is not exempt from the general rule that such a departure executes a removal order can be found in 8 C.F.R. § 245a.2(m)(2)(i), which expressly provides that. "A temporary resident alien[5] will not be considered deported if that alien departs the United States while under an outstanding order of deportation issued prior to the approval of temporary resident status;". In *Russello v. United States*, the Supreme Court observed that "[w]here Congress includes particular language in one section of a statute but omits it from another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." 464 U.S. 16, 23 (1983). Inasmuch as "we look to general rules of statutory construction to interpret and analyze the pertinent regulations", *Matter of H-N-*, 22 I. & N. Dec. 1039, 1041 (BIA 1999), therefore the fact that the Secretary of Homeland Security adopted a regulation which provides that Temporary Residents don't execute their removal orders when they depart the U.S. shows that the Secretary intended that persons who were in a Temporary Protected Status who departed the U.S. while

---

[5] That is, someone who has successfully applied for legalization under the amnesty provision of 8 U.S.C. § 1255a.

under an outstanding removal did execute their removal orders. This point is reinforced by the fact that the two provisions of law are not merely in the same Title and Chapter of the Code of Federal Regulations, but in fact only one Part removed from the other.

Finally, the USCIS' Adjudicator's Field Manual § 54.2, which, at the time of Mr. Galindo's departure and adjustment of status was "binding on all USCIS officers", Adjudicator's Field Manual § 3.4 (2019), Exhibit D at 3, provided that at that time that a departure with advance parole did in fact execute a removal order. Exhibit E at 8 ("Note: If an alien who is the subject of an outstanding order of removal, departs from the U.S., even with an advance parole, he or she effects the order (i.e. self-deports. See section 101(g) of the Act"). As the Court can see for itself, Mr. Galindo departed under a grant of advance parole. Exhibit B.

Accordingly, Mr. Galindo's complaint is not barred by 8 U.S.C. § 1252(a)(5) or (g) because his departure from the United States executed his removal order, and so there is no order now for this action to seek the review of, directly or indirectly.

**II.     The Complaint states a claim for relief under 5 U.S.C. § 706(2). \**

Mr. Galindo's action to hold unlawful and set aside the decision denying his application for adjustment of status as not in accordance with law identified two reversible errors in the decision – one that it held that the USCIS had no jurisdiction over his application because the Immigration Judge supposedly had jurisdiction over it, and the other that he was not eligible for adjustment because he had not been inspected and admitted or paroled into the U.S.  These holdings were not in accordance with law because: 1) Mr. Galindo was an arriving alien and Immigration Judges generally lack jurisdiction over the applications for adjustment of status filed by arriving aliens; 2) in any event, Mr. Galindo's removal proceedings had been terminated by his departure from the U.S.; 3) he was inspected and paroled into the U.S. as a parolee; but, 4) even if under the MTINA he was deemed to have been "inspected and admitted" in his TPS status, that still satisfied the

requirement that he had been inspected and admitted. As has been shown above and will now be further shown, the USCIS has been unable to rationalize any of these legal errors.

A. **Mr. Galindo is, as a matter of law and fact, an "Arriving Alien"**

Mr. Galindo was paroled into the United States on August 11, 2016. Exhibit B. Therefore he is an arriving alien. *Matter of Oseiwusu*, 22 I. & N. Dec. 19, 19-20 (B.I.A. March 25, 1998) ( "The respondent was paroled into the United States upon his arrival pursuant to a grant of advance parole. … Given the fact that the respondent was paroled into the United States, he falls within the definition of an 'arriving alien.'"). Nevertheless, the agency claims that "Plaintiff cannot be and does not claim to be an arriving alien. This term of art, defined by 8 C.F.R. § 1.2, means

> An applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means… However, an arriving alien who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under [8 U.S.C. § 1225(b)(1)(A)(i)]."

ECF Doc. 15-1 at 6.

There are two problems with USCIS' argument. First, it is contrary to *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997), in which the Supreme Court held that "Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless '"plainly erroneous or inconsistent with the regulation."' Published decisions of the Board of Immigration Appeals contain the Secretary of Homeland Security's definitive interpretations of his regulations because "Except as Board decisions may be modified or overruled by the Board or the Attorney General, decisions of the Board, and decisions of the Attorney General, shall be binding on all officers and employees of the Department of Homeland Security

…" 8 C.F.R. § 103.10(b). Therefore the BIA's determination that a parolee is an arriving alien[6] is entitled to *Auer* deference in interpreting 8 C.F.R. § 1.2.

Second, the fact that advance parolees will not be treated as arriving aliens under § 1225(b)(1)(A)(i) actually shows that they **will** be treated as arriving aliens for all other purposes. *Jennings*, *supra*. So too here, the fact that the regulatory definition of arriving alien expressly states that certain parolees will not be considered arriving aliens under § 1225(b)(1)(A)(i) precludes the USCIS' argument that they should not be considered arriving aliens for other purposes. "(W)e look to general rules of statutory construction to interpret and analyze the pertinent regulations", *Matter of H-N-*, 22 I. & N. Dec. 1039, 1041 (BIA 1999). Further, any other reading would render the reference to § 1225(b)(1)(A)(i) superfluous, thereby contravening " the basic interpretive canon that '[a] statute should be construed [to give effect] to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."'' *Corley v. United States*, 556 U.S. 303, 304, 129 S. Ct. 1558, 1560 (2009) , *Hibbs* v. *Winn*, 542 U.S. 88, 101, 124 S. Ct. 2276, 159 L. Ed. 2d 172.

Finally, the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 ("MTINA") simply directs the USCIS to inspect and admit TPS beneficiaries in "the same immigration status the alien had at the time of departure." However, the record shows that the USCIS did not comply with it, but rather paroled Mr. Galindo into the U.S., making him an arriving alien. Exhibit B. Thus MTINA is irrelevant here.

Nevertheless, USCS cites *Gonzalez v. Mayorkas*, Doc. 1:13-cv-1230, 2014 WL 585863, *5 (E.D. Va. Feb. 12, 2014) as support for the claim that a paroled TPS beneficiary is not an arriving alien due to MTINA. But *Gonzalez* was not based upon the MTINA but rather upon the court's unsupported opinion that "The grant of parole does not erase petitioner's original entry without inspection, nor does it convert his status to that of an arriving alien." *Gonzalez* at *20-23. In short, the Gonzalez court appeared to treat entry without inspection as a permanent condition, uncurable by subsequent entries with inspection or parole, at least as it pertains to adjustment of status.

---

[6] Except for the purposes of 8 U.S.C. § 1225(b)(1)(A)(i).

However, contrary to the court's reasoning, nowhere is it stated in 8 U.S.C. § 1255 that a person who enters the U.S. at any time without inspection is thereafter permanently barred from adjustment. Rather, it simply states in material part that " The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General,". Nowhere can it be found in this or any other section of the INA the rule that once a noncitizen enters without inspection he can never thereafter be deemed to have been inspected or admitted and paroled, even if he in fact is inspected and paroled. In fact it is by no means unusual for persons who once entered without inspection to subsequently become eligible to adjust status by means of departing the U.S. with advance parole and then being "inspected and paroled" into the U.S.

For example "during the period when they were protected from deportation by the Executive Order, many Chinese nationals who entered the United States without inspection or parole applied for advance parole. For the first several weeks of the period for filing applications for status adjustment under the CSPA, the INS granted advance parole liberally to Chinese nationals pursuant to a directive to its field offices known as Cable 1. Thus, these individuals were able to 'cure' their initial illegal entry into the United States and become eligible for status adjustment by virtue of the advance parole." *Chan v. Reno*, 95 Civ. 2586 (RWS), 1997 U.S. Dist. LEXIS 3016, at *7 (S.D.N.Y. Mar. 14, 1997). Since it does not appear that the USCIS is arguing, as the *Gonzalez* court held, that as a general rule no subsequent inspection and admission or parole qualifies a person who originally entered without inspection for adjustment of status, but merely that TPS protectees were singled out to be burdened by such a rule because of the MTINA, *Gonzalez* does not support defendant's argument.

The USCIS likewise cites to *Pineda v. Wolf,* Civil Action Doc. 19-11201-RGS at 2 ("Pineda's argument that his status changed to that of an 'arriving alien' when he returned to the United States after being given permission to depart is simply wrong."). However, there is nothing in the Pineda decision which states the plaintiff there was "paroled" into the U.S. nor, if he was, does the court explain its failure to give deference to the Board's decision in *Oseiwusu*. Nor

11

was it even considered whether the plaintiff's departure terminated his removal proceedings. Therefore this case is of no precedential value. " It is a well-established principle of interpretation that courts are 'not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio.'" *Doe v. Exxon Mobil Corp.*, 374 U.S. App. D.C. 205, 212, 473 F.3d 345, 352 (2007), quoting United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38, 73 S. Ct. 67, 97 L. Ed. 54 (1952). See also Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 119, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984); Hagans v. Lavine, 415 U.S. 528, 533 n.5, 94 S. Ct. 1372, 39 L. Ed. 2d 577 (1974).

Further, even though the Court in Espinosa commented that the plaintiff there was not an arriving alien, this was not a basis for deciding the case. Rather it was based on lack of jurisdiction due to § 1252(a)(5) and so the comments about arriving aliens was dictum. The term dictum refers to an expression in an opinion which is not necessary to support the decision reached by the court.' BALLENTINE'S LAW DICTIONARY 346 (3d ed. 1969). Aka v. Wash. Hosp. Ctr., 116 F.3d 876, 894 n.11 (D.C. Cir. 1997). Further, Espinosa is not precedent for the claim that Mr. Galindo's departure did not execute his removal proceeding because that argument was apparently not even raised there. See Doe, supra.

In short, the record shows that Mr. Galindo was paroled into the U.S., Exhibit B, and the law shows that a parolee is arriving alien for all purposes except 8 U.S.C. § 1225(b)(1)(A)(i) which is immaterial here.

B. Regardless of whether Mr. Galindo is an arriving alien, the USCIS had jurisdiction over his application and he qualified for adjustment as a person who was inspected and admitted or paroled.

In any event, it hardly makes a difference whether Mr. Galindo is an arriving alien since the USCIS would have jurisdiction over his application for adjustment of status even if he were not one, inasmuch as his removal proceeding were terminated by his departure. 8 C.F.R. § 1245.1(c)(8)(ii)(A).

Further, even if the USCIS is correct that the MTINA requires that a TPS beneficiary who enters the U.S. with advance parole be considered as a matter of law to have been "inspected and admitted" in the status in which he held before departure, regardless of what actually happened, this still means that Mr. Galindo satisfied the statutory requirement of being "inspected and admitted". Any other reading would lead to the conclusion that a person who was "inspected and admitted" was not "inspected and admitted".

This remains true even if the USCIS is correct that MTINA required that Mr. Galindo was inspected and admitted to the United States in the status "of an alien who entered without inspection", he **still** would satisfy the requirement of 8 U.S.C. § 1255(a) that an applicant for adjustment of status have been "inspected and admitted (or paroled)" into the U.S. Nowhere is it required that one have been "inspected and admitted (or paroled)" in any particular status, nor does anything in § 1255 disqualify for adjustment someone who was inspected and admitted to the United States in the **status** "of an alien who entered without inspection" even if such a "status" existed, which of course the Board held it did not.

II. THERE IS NO ADVANTAGE TO ANYONE, AND GREAT INCONVENIENCE TO MR. GALINDO, IN TRANSFERRING THIS NEARLY COMPLETE CASE TO TEXAS

**A. The USCIS Itself is Inconvenienced by its Proposed Transfer**

One would think that a party proposing a transfer of locations could at least point to some convenience to itself, if no one else, in doing so. But the agency cannot. It is based in this District. Its attorneys are based in this District. If its motion is granted it will face the choice of either flying its counsel to Texas for every subsequent hearing, or consume the expensive time of its local lawyers in educating them on this case. In either event, transfer is a losing proposition, even for the party making the motion. Although It claims "The parties and their counsel will have much easier access to witnesses and other sources of proof if the case is transferred to the Northern District of Texas" ECF Doc. 15-1 at 32, under the APA, judicial review of an agency decision is typically limited to the administrative record. *Kappos v. Hyatt*, 566 U.S. 431, 438 (2012). Therefore, given that there

will be no witnesses and data can be instantly transferred around the world, the agency's claimed advantages to moving this case are illusory, even to itself.

**B.  The Inconvenience to Mr. Galindo in Moving This Case are Substantial.**

Mr. Galindo's legal counsel is not admitted to the U.S. District Court for the Northern District of Texas and even if he were, it would be prohibitively expensive for the plaintiff to pay counsel for his substantial time and expenses in flying to Texas for hearings. That means Mr. Galindo will need to retain new legal counsel in Texas. This attorney is one of only a handful of lawyers in the country with substantial experience in immigration related cases under the Administrative Procedure Act, having represented plaintiffs in scores of the same. He could not identify even a single attorney who has handled an immigration related APA action in Texas. He has no idea who, if anyone, Mr. Galindo could find even willing to step into this case this late in the proceedings, much less one competent in the issues raised here. Whoever it was would certainly want a substantial fee which Mr. Galindo could ill-afford have already engaged one attorney for this purpose. It is not unlikely that the plaintiff would abandon this litigation altogether when faced with the prospect of paying for it twice. This outcome cannot have been unanticipated by the agency in making this motion.

**C.  There is no convenience to the Courts in moving this case to Texas.**

Although the USCIS points to the fact that it takes longer to have a trial in the District of Columbia, APA actions are not tried but decided on summary judgment, as this is being. Given that cases are disposed of without trial more quickly in this district than in the Northern District of Texas, the convenience of the Court actually weighs *against* transfer.

**D.  This is not a local controversey.**

To quote the USCIS:

> Finally, the interest in deciding local controversies at home also weighs in favor of transfer. "[I]n determining whether a controversy is local, courts have often considered a

14

variety of different factors . . . includ[ing] 'whether the decision directly affected the citizens of the transferee state; the location of the controversy, whether the issue involved federal constitutional issues rather than local property laws or statutes, whether the controversy involved issues of state law, whether the controversy has some national significance, and whether there was personal involvement by a District of Columbia official.'" *Aracely, R.*, 319 F. Supp. 3d at 131 (quoting *Otay Mesa Prop. L.P. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 122, 126 (D.D.C. 2008)). ECF No 15-1 at 24.

      None of these factors suggest that this is a local controversy. 1) The only person(s) of the transferee state would be affected by it are Mr. Galindo and his family, who of course oppose transfer. 2) The location of the controversy is only nominally in Texas. In reality, the issue here are common to one particular group – TPS beneficiaries who have departed the U.S. under orders of removal and returned with advance parole. There is no reason to expect to find any more of them in Texas than any other part of the country where TPS beneficiaries live. 3) Whether the controversey has some national significance, which it does because, again, the persons who would affected by the decision are spread out across the nation. 4) Whether there was personal involvement by a District of Columbia official. It is apparent through the fact that a note was added to the USCIS Policy Manual, which reflects USCIS Policy which is presumably created where the agency's policymakers are located, that D.C. officials have an marked interest in the issues at stake here.

In short, there is nothing local about this controversey. Not only does it only affect TPS beneficiaries who are spread out all over the country, but the fact that the argument which the agency primarily relies upon was recently incorporated into the USCIS' Policy Manual shows that this is an interest being shaped and managed by USCIS officers in policymaking positions in Washington.

In short, it is to no one's advantage to transfer this case to Texas. It is inconvenient to both parties, but substantially more to Mr. Galindo than to the USCIS. The fact that the USCIS would file a motion that doesn't even benefit it should make the Court ask what its real

15

motivation is here. If its intends to cost Mr. Galindo so much money that he drops the suit, and/or force him to replace his current counsel with one less knowledgable about this case and administrative law in general, then it could hardly have chosen a more effective means of doing so.

## **CONCLUSION**

This Court should deny the Defendant's motion.

Respectfully Submitted June 10, 2020.

s/Michael E. Piston (MI 002)
Michael E. Piston
Immigration Law Offices of Los Angeles
(Manhattan Office)
225 Broadway Suite 225
New York, NY 10007
646-845-9895